[This opinion has been published in *Ohio Official Reports* at 75 Ohio St.3d 48.]

DAYTON BAR ASSOCIATION *v*. OVERMAN.

[Cite as *Dayton Bar Assn. v. Overman*, 1996-Ohio-252.]

*Attorneys at law—Misconduct—Permanent disbarment—Failure to maintain client funds in identifiable bank account—Engaging in conduct prejudicial to the administration of justice—Engaging in conduct adversely reflecting on fitness to practice law—Neglect of an entrusted legal matter—Charging a clearly excessive fee—Conduct involving fraud, deceit, dishonesty, or misrepresentation—Representation without adequate preparation.*

(No. 95-2139—Submitted February 6, 1996—Decided February 22, 1996.)

ON CERTIFIED REPORT by the Board of Commissioners on Grievances and Discipline of the Supreme Court, No. 93-52.

———————————

{¶ 1} Relator, Dayton Bar Association, filed a complaint and amended complaint with the Board of Commissioners on Grievances and Discipline of the Supreme Court ("board"), charging respondent, John Laurence Overman of Cincinnati, Ohio, Attorney Registration No. 0044025, with numerous counts of professional misconduct. A panel appointed by the board heard the matter on July 25 and 26, and December 19 and 20, 1994.

{¶ 2} The panel found that respondent violated DR 9-102(A) (failure to maintain client funds in identifiable bank account) because he regularly deposited unearned fees in his personal savings or checking account.

{¶ 3} The panel found that respondent violated DR 1-102(A)(5) and (6) (engaging in conduct that is prejudicial to the administration of justice and that adversely reflects on fitness to practice law) and 6-101(A)(3) (neglect of an entrusted legal matter) in representing Reba Hawkins during 1992. Hawkins paid

respondent $400 to defend her in a criminal matter pending in Franklin County Municipal Court. The week before the scheduled trial, respondent advised Hawkins that the trial had been postponed and that she should contact him later about a new date. Hawkins grew concerned in the days that followed when she had no success in reaching respondent. She later learned from court officials that her trial had not been postponed, and she appeared in court as scheduled. Respondent did not appear on the trial date and also failed to appear a month later at a contempt hearing. Hawkins appeared at the contempt proceedings and was so exasperated with respondent that she pleaded no contest to the charge against her. Respondent later refused to refund Hawkins's money, challenging her to sue him in small claims court. Respondent finally returned Hawkins's $400 in July 1994.

{¶ 4} The panel also found that respondent violated DR 2-106(A) (charging a clearly excessive fee) in representing Elvin Catlett, Jr. during 1993. Respondent accepted $500 to obtain Catlett's immediate release from a city jail. When Catlett was not released promptly, he discharged respondent, who agreed to return the paid fee. Respondent subsequently reconsidered, advising Catlett that he would retain some part of the fee as earned. Respondent promised Catlett a letter that would account for the fee, but Catlett did not receive it. Respondent also did not reply to a letter from another attorney who requested repayment on Catlett's behalf. Respondent ultimately repaid Catlett's money in July 1994—several weeks prior to the panel hearing and more than two years after respondent received the fee.

{¶ 5} The panel further found that respondent violated DR 1-102(A)(6) in representing Terry L. Martin during 1993. Martin paid respondent $800 to defend him in a criminal matter. Respondent appeared at Martin's arraignment, but he was fifteen minutes late for a subsequent pretrial conference. For this and other reasons, Martin grew to suspect respondent's commitment to his case, and he eventually discharged him. Martin requested a $200 refund, as respondent had spent only three hours on the case, and respondent agreed to return at least that amount. In

April 1993, respondent wrote Martin a $200 check, but stopped payment before Martin could cash it. After months of stalling, respondent finally repaid Martin $200 in August 1993 and an additional $600 early in 1994.

{¶ 6} The panel found that respondent violated DR 1-102(A)(4) (conduct involving fraud, deceit, dishonesty, or misrepresentation) and (5) in representing clients before the Montgomery County Common Pleas Court, Juvenile Division, during July 1993. Respondent either forged or arranged to have forged two entries in different custody actions by photocopying a legitimate court order. Respondent also prepared, notarized and filed an affidavit of indigence in one of these cases without the court's permission, which is required by local rule.

{¶ 7} The panel also found that respondent filed at least one false affidavit of indigence in the Montgomery County Juvenile Court during 1992 and that he had thereby violated DR 1-102(A)(4) and (5). Respondent filed the affidavit for a client who was not indigent and who had paid respondent to represent him in a change of custody proceeding. Respondent falsely represented the client's inability to afford counsel in order to "save" payment of court costs.

{¶ 8} The panel found that respondent violated DR 1-102(A)(6) and 6-101(A)(3) in representing Daryle T. Wheeler. In March 1993, respondent agreed to represent Wheeler in his divorce for a fee of $180. Wheeler advised respondent that he did not know his wife's whereabouts, but that he hoped to remarry soon and had set June 5, 1993 as the wedding date. In preparing for his wedding, Wheeler attempted to obtain a marriage license with a document that respondent had given him for this purpose. The marriage license bureau refused to issue the license. When Wheeler advised respondent, respondent called Wheeler's pastor and suggested the pastor conduct a "mock wedding," with the official wedding to be conducted after the divorce became final. The pastor refused. Then, in trying to obtain service on Wheeler's wife, respondent proposed that the papers be sent to

the wife's last known address in Kansas City and, if she didn't sign for them, that Wheeler encourage someone to forge her signature.

{¶ 9} Wheeler eventually obtained his divorce on his own by serving his wife by publication. Respondent appeared in court when the divorce decree was issued. Wheeler's divorce did not become final in time for his June 1993 wedding, however, and the event had to be canceled, costing Wheeler and his fiancee approximately $2,300.

{¶ 10} The panel further found that respondent violated DR 1-102(A)(4), (5) and (6) in representing LaDonna Harris during 1993. Harris paid respondent $280 to represent her in the dissolution of her marriage. Respondent directed Harris and her estranged husband to sign the dissolution paperwork in blank. He later filled in false information about their employment and earnings.

{¶ 11} Respondent also agreed to obtain a restraining order for Harris for an additional fee of $80. The day after Harris paid respondent for this service, she reconsidered the request and asked for an $80 refund. On respondent's instruction, Harris went to his office the next day to be repaid. She waited for him for over an hour, but he did not appear. Respondent also failed to refund her money after two more requests, one time advising her that the dissolution costs had been more than he had anticipated and that he actually owed her nothing.

{¶ 12} Respondent filed Harris's dissolution action in April 1993. At a hearing on the dissolution, respondent misrepresented to a judge inquiring about child support that Harris was unemployed. When Harris attempted to correct him and advise the judge that she was and had been employed, respondent told her to "be quiet." The judge rejected affidavits of income that respondent had filed with false information. The panel specifically determined that respondent lied to the domestic relations court about the Harrises' income.

{¶ 13} After the dissolution hearing, Harris tried many times to contact respondent, but had little success. Respondent later sent a letter to Harrris accusing

4

her of having used racial slurs and declaring his intention to withdraw as her counsel in the dissolution. Respondent also threatened to report Harris to a civil liberties organization if she objected to his withdrawal. Respondent filed his notice of withdrawal with the domestic relations court, but was subsequently found in contempt for filing a withdrawal request without the required court approval, for failing to file a decree in the Harris case, and for failing to appear at a show cause hearing on these issues. Respondent eventually prepared the required decree and refunded the $80 Harris had requested earlier.

{¶ 14} The panel found that respondent violated DR 1-102(A)(4) and(6) in representing Teresa A. Hamlin in a bankruptcy proceeding during 1993. Hamlin paid respondent $300 on his representation that half the amount would pay his fee for filing the petition in bankruptcy and the other half would pay all court costs and expenses. Hamlin provided respondent with her financial information and signed bankruptcy forms in May 1993. In June, Hamlin advised respondent that a creditor had contacted her. Respondent assured Hamlin that a petition had been filed and that her creditors would be notified of the bankruptcy. However, other creditors started contacting Hamlin, and she soon had to again alert respondent, who just told her not to worry. On July 19, 1993, Hamlin met with respondent and received a copy of her bankruptcy petition, which had just been filed earlier that day. In July, Hamlin also received from the bankruptcy court an "application and order to pay filing fee in installments" on which her signature had been placed without her authorization. When Hamlin asked respondent about the forged signature, he evaded her question. The panel specifically found that respondent falsified documents he filed in the bankruptcy court.

{¶ 15} The panel also found that respondent violated DR 1-102(A)(2) [*sic,* (5)] and 6-101(A)(2) (representation without adequate preparation) in representing Tonya Stoney in a divorce action during 1993. Stoney testified in court that she had been employed since December 1992; however, court records revealed that she

had signed an affidavit in 1993 indicating that she was unemployed. Respondent had prepared the affidavit for Stoney's signature, notarized it, and filed it on Stoney's behalf. At the hearing on Stoney's divorce, respondent further failed to present corroborating witnesses as required by Civ. R.75(L), demonstrating to the court's satisfaction that he was unaware of this requirement.

{¶ 16} Finally, the panel found that respondent committed two violations of DR 1-102(A)(4) and another violation of DR 1-102(A)(5) in representing Susan Farthing during divorce proceedings in 1993. Farthing paid respondent $380, which he represented to be the fees and costs for the entire proceeding. Thereafter, respondent signed Farthing's name on an affidavit of custody without her authority, notarized her forged signature, and filed the affidavit in court. Respondent also instructed Farthing to sign an affidavit of indigence, even though she was able to pay, and he directed her to sign a blank copy of an affidavit of income and expenses on which he later filled in false information. The affidavit of custody and other papers were dated May 31, 1993, a date on which Farthing did not sign any documents. The panel concluded that respondent had again filed falsified documents in court.

{¶ 17} The panel found little in the record to militate against imposition of a severe sanction for this misconduct. Respondent graduated from law school in 1989 and was admitted to the practice of law in 1990, after passing the bar examination on his second attempt. He has been a sole practioner nearly from the beginning, he employed a secretary intermittently, and he received most of his clients from a Yellow Pages advertisement. Although respondent subpoenaed many judges and referees to provide testimony or correspondence concerning his professional ability, the panel received only one letter that described respondent as competent and heard only one character witness. That witness, a judge, told respondent, "There is the feeling that you really don't know what you are doing. That is the feeling of the court."

6

{¶ 18} In addition, respondent testified to his perception that local bankruptcy, domestic relations, and juvenile courts were conspiring against him. He filed at least fifteen ethics grievances against these judges or their staff members, usually for rulings or administrative decisions that he considered to be persecution. In a motion filed with the board, respondent also accused one bankruptcy judge of having accepted a bribe from relator's counsel to "fix" the court's system for making judicial assignments as a means to further the counsel's bankruptcy practice and defeat respondent's business prospects. Respondent had no evidence to substantiate this allegation. Respondent further accused the bankruptcy judge of treating him and his clients unfairly because the judge was religiously and racially biased. This accusation, too, was based purely on his speculation.[1]

{¶ 19} The panel received no evidence of substance abuse, and respondent denied mental illness. Respondent submitted a doctor's report confirming that he did not need psychiatric counseling and that "no clinical diagnosis was appropriate." Respondent was also evaluated by a psychiatrist upon order of the board pursuant to Gov.Bar. R. V(7)(C) also evaluated respondent. This psychiatrist essentially agreed with respondent's physician, but added:

"While there is no evidence of overt illness [in respondent], his behavior, his demeanor, and his history are indicative of a distortion of reality and inability to function in a socially acceptable and professional manner."

{¶ 20} In reviewing this evidence, the panel summarized respondent's misconduct as a "course of conduct" characterized by "(1) neglect of legal matters; (2) lying to clients and the courts; (3) being unable to get along with anyone and

---

1. Respondent's testimony was marked by a number of other irrational perceptions. One of the most bizarre was his suspicion that he was not wanted in bankruptcy court because he drove women away. Respondent also thought that he was treated unfairly because his middle name was Linus. He consequently changed his middle name to Laurence.

blaming his incompetence on others; and (4) being totally unable to practice law in any rational manner." The panel further observed that "[r]espondent has wreaked havoc on the legal system in and around Dayton, which might explain his relocation to Cincinnati." The panel concluded:

"Unfortunately, Respondent began practicing law with no 'mentoring' and has really no idea about the proper practice of law. We simply cannot allow Respondent to continue to practice law in this manner -- the actual and potential harm is too great."

{¶ 21} The panel rejected the sanction recommended by relator, permanent disbarment, and instead recommended an indefinite suspension from the practice of law. The board adopted the panel's findings of misconduct; but recommended that respondent be permanently disbarred. The board recommended disbarment "[i]n consideration of the number of disciplinary violations and Respondent's complete inability to act as a lawyer without engaging in habitual acts of fraud and deceit resulting in repeated abuses of the judicial system * * *."

—————————————

*John Paul Rieser*, for relator.
*John Laurence Overman, pro se.*

—————————————

***Per Curiam.***

{¶ 22} Upon review of the record, we concur in the board's findings of misconduct and agree with the recommended sanction. Respondent is therefore ordered permanently disbarred from the practice of law in Ohio. Costs taxed to respondent.

*Judgment accordingly.*

MOYER, C.J., DOUGLAS, GLASSER, RESNICK, F.E. SWEENEY, PFEIFER and COOK, JJ., concur.

GEORGE M. GLASSER, J., of the Sixth Appellate District, sitting for WRIGHT, J.

_____